UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF LOUISIANA

**UNITED STATES OF AMERICA**

**VERSUS**

**LEARTAY WALKER**

**CRIMINAL ACTION**

**NO. 24-97-JWD-EWD**

### RULING AND ORDER

This matter comes before the Court on the *Motion to Suppress Evidence Seized Pursuant to Search of Baystone Avenue* ("*Motion to Suppress*") (Doc. 32) filed by Defendant Leartay Walker ("Defendant" or "Walker"). The Government opposes this motion. (Doc. 34.) The Court held a hearing on January 14, 2026. (Doc. 38.) The Court has carefully considered the law, the facts in the record, and the arguments and submissions of the parties and is prepared to rule. For the following reasons, Defendant's *Motion to Suppress* is denied.

**I.    BACKGROUND**

On May 15, 2024, Trooper David Hernandez ("Hernandez") of the Louisiana Department of Public Safety applied for a warrant ("the Baystone Warrant") to search 42490 Baystone Avenue, Prairieville, Louisiana ("the Baystone Residence"). (Doc. 34 at 4; Doc. 37-1 at 1.) That same day, Judge Jimmy Kuhn of the Twenty-Third Judicial District Court of Louisiana signed the search warrant. (Doc. 34 at 4.) State troopers and deputies with the Narcotics Division of the East Baton Rouge Sheriff's Office ("EBRSO") executed the search warrant on May 22, 2024. (*Id.*; Doc. 32-1 at 1.) The search yielded "approximately 9.8 pounds of powdered synthetic marijuana" and drug paraphernalia, as well as three firearms, two of which were located in a safe to which Defendant had the key. (Doc. 34 at 4–5.) On December 4, 2024, a grand jury indicted Defendant for one count of possession of firearms by a convicted felon, in violation of 18 U.S.C. § 922(g)(1). (Doc. 1 at 1.)

Defendant was arrested on this federal charge on December 26, 2024. (Doc. 4 at 1.) He now moves to suppress all evidence obtained during the search of the Baystone Residence on the ground that the warrant application—specifically, Hernandez's supporting affidavit—was deficient. (Doc. 32-1 at 1, 3–4.)

II.   **BAYSTONE WARRANT**

The Baystone Warrant—signed by Judge Kuhn—described the Baystone Residence and authorized a search thereof for the purpose of seizing, *inter alia*, "[a]ny chemical compounds in powder form," "[s]olvents," "[s]pray bottles/dispensers," "[p]aper products that may have been treated" (i.e., with synthetic marijuana), "[m]ail and/or addresses intended for . . . inmate[s]," firearms, and U.S. currency. (Doc. 37-1 at 1–2, 7, 9–11.) In support of this warrant, Hernandez swore the following: On May 10, 2024, Sergeant Eric David ("David") of the EBRSO Narcotics Division contacted Hernandez because David's investigation of Defendant "ha[d] expanded [from East Baton Rouge Parish] to Ascension Parish." (*Id.* at 2.)

Subsequently, in support of the Baystone Warrant, David relayed to Hernandez that, on March 13, 2024, investigators with the Nineteenth Judicial District Attorney's Office informed the EBRSO Narcotics Division that inmates at Catahoula Correctional Facility and East Baton Rouge Parish Prison had been "buying and receiving illegal narcotics while incarcerated." (*Id.* at 3.) Specifically, investigators reported "numerous jail calls" where inmates discussed purchasing "sheets."[1] (*Id.*) Investigators linked the sale of "sheets" to the Instagram account "TayySmilez." (*Id.*) David forwarded the account to Lieutenant Brandon Berggren ("Berggren") of the EBRSO Violent Crimes Unit. (*Id.*) Using various databases, Berggren identified Defendant as the owner

---

[1] "Sheets" are "small pieces of dissolvable paper that are coated with synthetic marijuana" and which can be smoked or dissolved orally. (Doc. 37-1 at 3.) "[C]hemical compounds used for synthetic marijuana are generally found in bulk powder form" but can be "dissolved in solution" and "sprayed onto paper products" like mail in order to secret them into jails and prisons for distribution and use. (*Id.*)

2

of the Instagram account and obtained Defendant's most recent address ("the Cobblestone Residence")—located on Cobblestone Avenue in Geismar, Louisiana. (*Id.*) Berggren also obtained Defendant's cellphone number. (*Id.*)

Using East Baton Rouge Parish Prison's inmate phone system, David confirmed Defendant's cellphone number. (*Id.* at 4.) He then "intercepted and transcribed" multiple calls wherein Defendant discussed the sale of "sheets" with inmates, including on December 6, 2023; February 28, 2024; March 1, 2024; March 15, 2024; April 12, 2024; April 19, 2024; and May 2, 2024. (*Id.* at 4–6.) On March 27, 2024, Judge William Jordan of the Nineteenth Judicial District Court signed a "Pen Trap and Trace Search Warrant." (*Id.* at 5.) Beginning April 4, 2024, David "began receiving pings" for Defendant's cellphone. (*Id.*) These pings had a radius of 3,300–5,000 meters and placed Defendant "within the area" of the Cobblestone Residence. (*Id.*) On April 5, 2024, EBRSO agents physically observed Defendant at the Cobblestone Residence. (*Id.*) Of the four vehicles parked at the Cobblestone Residence—including in the garage—at least three were registered to the residence and owned by Marlon and Toni Brady. (*Id.*)

During a jail call on April 12, 2024, Defendant explained that he stored drug proceeds in two safes located "at his house [and] his mom's house" and that he had a lot of money stashed in each. (*Id.*) Then, on May 13, 2024, David learned that the Baton Rouge Police Department ("BRPD") had stopped Defendant and his girlfriend, Diamond Smith ("Smith"), while they were driving. (*Id.* at 6.) "During the traffic stop, [Defendant] fled the scene on foot." (*Id.*) "Smith was booked into the East Baton Rouge Parish Prison for active Bench Warrants." (*Id.*) From this episode, David and Berggren learned that Smith resided at the Baystone Residence. (*Id.*) They then checked the aforementioned jail calls against ping data and determined that Defendant was in the radius of the Baystone Residence during "several jail calls in which [he] t[old] inmates that he was

3

at home or making . . . 'sheets.'" (*Id.*) These included the calls on April 12 and April 19, 2024. (*Id.*) Finally, on May 14, 2024, David physically surveilled the Baystone Residence, at which time he observed Defendant's vehicle "parked in the driveway in front of the residence." (*Id.* at 7.) Based on David's "years of experience" and the facts recited, he believed that Defendant was making "sheets" at the Baystone Residence, as well as "concealing or storing some of the illegal proceeds . . . at a safe in his mother[']s residence" (i.e., the Cobblestone Residence). (*Id.*)

### III. PARTIES' ARGUMENTS

#### A. Defendant's Motion to Suppress (Doc. 32)

Defendant notes that Hernandez's affidavit mostly relied on jail calls, cellphone pings which had a radius of 3,300–5,000 meters, and "[o]ccasional" physical surveillance. (Doc. 32-1 at 1.) Defendant explains that an affidavit in support of a search warrant must "demonstrate a connection between the alleged criminal activity and the residence to be searched." (*Id.* at 2 (citing *United States v. Satterwhite*, 980 F.2d 317, 321 (5th Cir. 1992)).) Here, he argues, the affidavit "did not establish probable cause to believe [that] contraband would be found" at the Baystone Residence, because (1) the jail calls did not mention the residence "or suggest that [it] contained drugs or firearms," and (2) the cellphone pings were imprecise. (*Id.* at 3.) Relatedly, Defendant contends that Hernandez's affidavit "was so conclusory that no reasonable officer could rely upon it in good faith." (*Id.* (citing *United States v. Leon*, 468 U.S. 897, 923 (1984); *United States v. Payne*, 341 F.3d 393, 400 (5th Cir. 2003)).)

#### B. Government's Opposition (Doc. 34)

The Government highlights the following: On May 13, 2024, David and Berggren "were able to determine that Smith lived at" the Baystone Residence. (Doc. 34 at 4.) Subsequently, they "match[ed] several jail calls in which Walker advised inmates that he was at home or making

4

'sheets.'" (*Id.*) Cellphone pings revealed that, "[a]t the time of these phone calls," Defendant was "at or near" the Baystone Residence. (*Id.*) Then, on May 14, 2024, David and Berggren physically surveilled the residence, at which time they "observed Walker's vehicle parked in the driveway." (*Id.*) The Government therefore contends that (1) the good-faith exception applies and (2) Hernandez's affidavit "adequately articulated the requisite probable cause." (*Id.* at 1.)

The Government explains that "[c]ourts confine their good-faith inquiry to 'the objectively ascertainable question whether a reasonably well trained officer would have known that the search was illegal despite the [judge's] authorization.'" (*Id.* at 6 (quoting *Leon*, 468 U.S. at 922 n.23).) Based on his experience, Hernandez "had no reason to believe that the information that he included" in his affidavit was deficient. (*Id.* at 6–7.) Further, the Government argues, law enforcement took "reasonable, gradual steps" during the investigation, including reviewing jail calls, tying the Instagram account to Defendant, using databases to identify Defendant's address and cellphone number, obtaining a "trap and trace" warrant, pinging Defendant's cellphone, and physically surveilling Defendant. (*Id.* at 7.) The Government argues that, given these steps, Hernandez's affidavit was also "adequately supported by probable cause." (*Id.* at 8.)

### C. Suppression Hearing

At the suppression hearing on January 14, 2026, the Government reiterated that Hernandez's affidavit "meticulous[ly]" established probable cause. (Hearing Jan. 14, 2026.) It also emphasized that the burden is on Defendant. (*Id.*) Consequently, the Government did not put on any witnesses, instead relying upon the "four corners" of Hernandez's affidavit. (*Id.*) According to the Government, the affidavit is not "bare bones," and so the good-faith exception applies. (*Id.*) Specifically, the Government pointed to Defendant's relationship with Smith, the fact that Smith was known to live at the Baystone Residence, the physical surveillance of Defendant at the

5

Baystone Residence on May 14, 2024, and the cellphone pings indicating that Defendant could have been at the Baystone Residence during jail calls where he discussed making "sheets." (*Id.*)

Defendant countered that nothing in Hernandez's affidavit suggested a nexus between Defendant's allegedly selling "sheets" and the Baystone Residence. (*See id.* ("The affidavit never answers the only question the Fourth Amendment requires: Why would evidence be inside Mr. Walker's home?").) Instead, Defendant observed, the affidavit mentioned jail calls and ping data with a radius of 3,300–5,000 meters. (*Id.*) Further, much of the affidavit focused on the Cobblestone Residence, not the Baystone Residence. (*Id.*)

## IV.   LEGAL STANDARD

"The Fourth Amendment requires that search warrants be issued only 'upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.'" *Dalia v. United States*, 441 U.S. 238, 255 (1979) (quoting U.S. Const. amend. IV). This language is "precise and clear." *Id.* (quoting *Stanford v. Texas*, 379 U.S. 476, 481 (1965)). It requires "three things": (1) "[W]arrants must be issued by neutral, disinterested [judges]." *Id.* (citing, *inter alia*, *Connally v. Georgia*, 429 U.S. 245, 250–51 (1977) (per curiam)). (2) "[T]hose seeking the warrant must demonstrate to the [issuing judge] their probable cause to believe that 'the evidence sought will aid in a particular apprehension or conviction' for a particular offense." *Id.* (quoting *Warden v. Hayden*, 387 U.S. 294, 307 (1967)). And (3) "warrants must particularly describe the 'things to be seized'" and the "place[s] to be searched." *Id.* (quoting *Stanford*, 379 U.S. at 485). "The proponent of a motion to suppress has the burden of proving, by a preponderance of evidence, that the evidence . . . was obtained in violation of his Fourth Amendment rights." *United States v. Smith*, 978 F.2d 171, 176 (5th Cir. 1992).

V.     **DISCUSSION**

    A. **Good-Faith Exception**

        1. *Applicable Law*

"Deference to the judge issuing the warrant and the exclusionary rule's focus on deterring police misconduct results in the good-faith exception to the suppression remedy . . . ." *United States v. Morton*, 46 F.4th 331, 336 (5th Cir. 2022) (en banc) (citing *Leon*, 468 U.S. at 922). Per the exception, the fruits of a search are admissible if "obtained by law enforcement officers acting in objectively reasonable reliance on a search warrant issued by a detached and neutral [judge]." *United States v. Pigrum*, 922 F.2d 249, 252 (5th Cir. 1991). The exception can apply even where "the affidavit on which the warrant was based is insufficient to establish probable cause." *Id.* (citing, *inter alia*, *Leon*, 468 U.S. at 927–28 (Blackmun, J., concurring)).

In considering whether the good-faith exception applies, a court confines its inquiry "to the objectively ascertainable question whether a reasonably well trained officer would have known that the search was illegal despite the [judge's] authorization." *Payne*, 341 F.3d at 400 (quoting *Leon*, 468 U.S. at 922 n.23). Typically, this determination hinges on examination of the affidavit. *Id.* The Fifth Circuit has explained that there are four situations where officers' reliance on a warrant is unreasonable, such that the good-faith exception does not apply:

> 1) the magistrate issued [the warrant] based on information the affiant knew was false or should have known was false but for reckless disregard of the truth; 2) the magistrate wholly abandoned the judicial role; 3) the warrant is based on an affidavit so lacking in probable cause as to render belief in its existence unreasonable; and 4) the warrant is facially deficient in particularizing the place to be searched or things to be seized.

*Morton*, 46 F.4th at 336 (citing *Leon*, 468 U.S. at 923; *United States v. Triplett*, 684 F.3d 500, 504 (5th Cir. 2012)).

### 2. *Analysis*

Here, Defendant "tries to defeat" the good-faith exception by invoking the third situation—i.e., by arguing that Hernandez's affidavit did not establish probable cause to search the Baystone Residence. *See Morton*, 46 F.4th at 336; *see also Messerschmidt v. Millender*, 565 U.S. 535, 546–47 (2012) (citing *Leon*, 468 U.S. at 921) ("Our precedents make clear . . . that the threshold for establishing this exception [to the good-faith exception] is a high one, and it should be."). Defendant is correct, of course, that a warrant application must be "supported by more than a 'bare bones affidavit.'" *Pigrum*, 922 F.2d at 252 (citing *United States v. Maggitt*, 778 F.2d 1029, 1035 (1985)); *accord United States v. Wilson*, 153 F.4th 478, 484 (5th Cir. 2025). That is, "the affidavit must provide 'the [issuing judge] with facts, and not mere conclusions, from which he could determine probable cause.'" *United States v. Gallegos*, 239 F. App'x 890, 894 (5th Cir. 2007) (quoting *Satterwhite*, 980 F.2d at 321); *see also Wilson*, 153 F.4th at 484 (explaining that "[s]uch 'bare-bones affidavits' are rare" (quoting *Satterwhite*, 980 F.2d at 320)); *Morton*, 46 F.4th at 336–37 (collecting examples of "bare bones" affidavits).

Likewise, Defendant is correct that, in order for the good-faith exception to apply, "[t]he affidavit must establish a nexus between the [place] to be searched and the evidence sought." *Gallegos*, 239 F. App'x at 895 (quoting *United States v. Freeman*, 685 F.2d 942, 949 (5th Cir. 1982)); *see also Wilson*, 153 F.4th at 485–86 (explaining that courts have "deemed affidavits bare bones when they [have] 'provided no information linking the [criminal] investigation to [the defendant's] residence'" (quoting *United States v. Brown*, 567 F. App'x 272, 282 (5th Cir. 2014))). Nexus "may be established . . . by direct observation or through normal inferences as to where the articles sought would be located." *Gallegos*, 239 F. App'x at 895–96 (citing, *inter alia*, *Freeman*, 685 F.2d at 949). "Under the good-faith exception, the question becomes 'whether officers

8

objectively could reasonably believe that there was such a nexus.'" *Wilson*, 153 F.4th at 485 (quoting *United States v. Norman*, 129 F.4th 874, 876 (5th Cir. 2025) (quoting *United States v. Bell*, 832 F. App'x 298, 301 (5th Cir. 2020) (per curiam))).

In *United States v. Wilson*, the Fifth Circuit determined that the good-faith exception did not apply where the affidavit in support of the search warrant "offered nothing—no observations, no inferences, no corroborated tips—linking" a green pistol involved in an aggravated assault at a Waffle House to the residence searched. *Id.* at 485; *see also id.* at 488 ("Here, nothing suggests that any crime—or evidence of one—ever touched [the residence]."). The court explained: "Even if [the defendant] lived there—and the record makes that claim dubious, at best—that fact alone cannot justify a search." *Id.* at 485. "[T]he fact that there is probable cause to believe that a person has committed a crime does not automatically give the police probable cause to search his house for evidence of that crime." *Id.* (quoting *Freeman*, 685 F.2d at 949).

Here, Hernandez's affidavit is rather detailed. But limited facts recounted therein suggest a nexus between Defendant's alleged criminal conduct and the Baystone Residence. Having carefully examined the affidavit, the Court identifies the following: First, after linking the Instagram account "TayySmilez" to Defendant, David and Berggren used various databases to find Defendant's listed address—the Cobblestone Residence, located in Geismar—as well as Defendant's cellphone number. (Doc. 37-1 at 3.) David confirmed that Defendant had placed multiple calls to inmates at East Baton Rouge Parish Prison. (*Id.* at 4.) During a jail call on April 12, 2024, Defendant explained that he stored drug proceeds in two safes located "at his house [and] his mom's house" and that he had a lot of money stashed in each. (*Id.* at 5.) While physically surveilling Defendant at the Cobblestone Residence on April 5, 2024, EBRSO agents determined that at least three of the vehicles parked at the residence—including in the garage—were registered

9

to the residence and belonged not to Defendant but to Marlon and Toni Brady. (*Id.*) David subsequently described the Cobblestone Residence as Defendant's *mother's* residence. (*Id.* at 7.) Based on the April 12 jail call, David was aware that Defendant resided at, and stored drug proceeds at, a second location. (*Id.* at 5.)

Second, on May 13, 2024, David learned that BRPD had stopped Defendant and Smith while they were driving and that Defendant had "fled the scene on foot." (*Id.* at 6.) "Smith was booked into the East Baton Rouge Parish Prison for active Bench Warrants." (*Id.*) From this episode, David and Berggren learned that Smith resided at the Baystone Residence. (*Id.*) They then cross-referenced ping data with jail calls, which revealed that Defendant was within the radius of the Baystone Residence at the same time as he was telling inmates that "he was at home or making . . . 'sheets.'" (*Id.*) These included calls on April 12 and April 19, 2024. (*Id.* at 5–6.) On May 14, 2024—the day after the traffic stop and Smith's booking—David physically observed Defendant's vehicle "parked in the driveway in front of the [Baystone Residence]." (*Id.* at 7.) David stated that, based on his "years of experience," he believed that Defendant was manufacturing "sheets" at the residence. (*Id.*) Aside from the Cobblestone and Baystone Residences, Hernandez's affidavit does not mention any locations where Defendant was surveilled or suspected to reside. (*See id.* at 2–7.)

Thus, unlike the affidavit in *Wilson*, Hernandez's affidavit contained some facts indicating that the Baystone Residence was one of the two addresses at which Defendant resided and at which he stored drug proceeds. (*Id.* at 4, 6–7.) It also contained some facts indicating that Defendant made "sheets" at the Baystone Residence. (*Id.* at 5–6.) These facts were coupled with David's statement that, based on his "years of experience," he believed that Defendant was making "sheets" at the residence. *See also Bell*, 832 F. App'x at 301–02. Even if it is a "close call" whether the above establishes probable cause, the nexus-related facts contained in Hernandez's affidavit are

not so thin that the affidavit can be classified as "bare bones." *See Morton*, 46 F.4th at 336–38 (explaining that, while it was "a close call whether the evidence recounted in the affidavits established probable cause," the affidavits did "have some meat on the bones"); *see also id.* at 338 ("As [the Fifth Circuit] ha[s] emphasized, on close calls second guessing the issuing judge is not a basis for excluding evidence."); *Pigrum*, 922 F.2d at 252 (explaining that the good-faith exception can apply even where "the affidavit on which the warrant was based is insufficient to establish probable cause").

This Court "do[es] not decide if the state judge should have authorized" the search of the Baystone Residence in the first place. *See Morton*, 46 F.4th at 339; *see also Leon*, 468 U.S. at 921–22. Rather, the Court decides only whether "the officers acted in good faith when relying on the judge's decision to issue" the Baystone Warrant. *See Morton*, 46 F.4th at 339. "Whatever one might conclude in hindsight about the strength of the evidence it recounts, [Hernandez's] affidavit is not 'wholly conclusory.'" *See id.* at 337 (quoting *Satterwhite*, 980 F.2d at 321). Nor was it objectively unreasonable for officers to believe that there existed the requisite nexus. *See Wilson*, 153 F.4th at 485; *see also United States v. Christian*, 925 F.3d 305, 313 (6th Cir. 2019) ("An affidavit need only present '*some* connection, regardless of how remote it may have been' . . . ." (quoting *United States v. White*, 874 F.3d 490, 497 (6th Cir. 2017))); *Leon*, 468 U.S. at 921 ("In the ordinary case, an officer cannot be expected to question the [issuing judge's] probable-cause determination . . . ."). The Court is bound to apply the good-faith exception; suppression is therefore inappropriate. *See Bell*, 832 F. App'x at 301.

### B. Probable Cause

#### 1. *Applicable Law*

Probable cause exists "where the facts and circumstances within the affiant's knowledge,

and of which he has reasonably trustworthy information, are sufficient unto themselves to warrant a man of reasonable caution to believe that an offense has been or is being committed." *Berger v. New York*, 388 U.S. 41, 55 (1967) (citations omitted). "Mere affirmance of belief or suspicion is not enough." *Nathanson v. United States*, 290 U.S. 41, 47 (1933).

However, "[b]ecause a search warrant provides the detached scrutiny of a neutral [judge], which is a more reliable safeguard against improper searches than the hurried judgment of a law enforcement officer engaged in the often competitive enterprise of ferreting out crime, . . . [the Supreme Court has] expressed a strong preference for warrants and declared that in a doubtful or marginal case a search under a warrant may be sustainable where without one it would fall." *Leon*, 468 U.S. at 913–14 (cleaned up). "Reasonable minds frequently may differ on the question whether a particular affidavit establishes probable cause, and [the Supreme Court] ha[s] thus concluded that the preference for warrants is most appropriately effectuated by according 'great deference' to [the issuing judge's] determination." *Id.* at 914 (quoting *Spinelli v. United States*, 393 U.S. 410, 419 (1969)). Thus:

> The task of the issuing magistrate is simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, including the 'veracity' and 'basis of knowledge' of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place. And the duty of a reviewing court is simply to ensure that the magistrate had a "substantial basis for . . . conclud[ing]" that probable cause existed.

*Illinois v. Gates*, 462 U.S. 213, 238–39 (1983) (quoting *Jones v. United States*, 362 U.S. 257, 271 (1960)).

### 2. Analysis

The Fifth Circuit uses "a two-step test to determine whether to apply the exclusionary rule": (1) Does the good-faith exception apply? *United States v. Mays*, 466 F.3d 335, 342–43 (5th Cir.

2006) (citing *United States v. Laury*, 985 F.2d 1293, 1311 (5th Cir. 1993)). (2) Was the warrant supported by probable cause? *Id.* If the good-faith exception applies, then step two is gratuitous, "unless the case presents a 'novel question of law whose resolution is necessary to guide future action by law enforcement officers and [issuing judges].'" *Id.* at 343 (quoting *Laury*, 985 F.2d at 1311). "Principles of judicial restraint and precedent dictate that, in most cases, [courts] should not reach the probable cause issue if a decision on the admissibility of evidence under the good-faith exception will resolve the matter." *Gallegos*, 239 F. App'x at 893 (internal quotation marks omitted) (quoting *United States v. Flanders*, 468 F.3d 269, 270 (5th Cir. 2006)).

Here, the Court has already determined that the good-faith exception applies. And Defendant's motion does not present a "novel question of law" requiring the Court to advance to the second step of the Fifth Circuit's two-step test. *See Mays*, 466 F.3d at 343 (quoting *Laury*, 985 F.2d at 1311); *Satterwhite*, 980 F.2d at 320. "Consequently, the Court will not venture beyond its finding that the good-faith exception applies." *See United States v. Davis*, No. 22-93, 2025 WL 3252566, at *10 (M.D. La. Nov. 21, 2025) (deGravelles, J.).

## VI. CONCLUSION

Accordingly,

**IT IS ORDERED** that Defendant's *Motion to Suppress Evidence Seized Pursuant to Search of Baystone Avenue* (Doc. 32) is **DENIED**.

Signed in Baton Rouge, Louisiana, on <u>February 13, 2026</u>.

_____
**JUDGE JOHN W. deGRAVELLES
UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF LOUISIANA**